IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBURY STREET CAPITAL, LLC, *et al.*, | ) | Case No. 24- |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

### DECLARATION OF JOHN A. HANRATTY

I am John A. Hanratty. I am over nineteen (19) years of age and am competent to give this declaration. The information that follows is based upon my personal knowledge and understanding.

1. I am the Managing Member of Ebury Street Capital, LLC ("ESC") and its related entities that have simultaneously filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court"). I founded ESC in 2013 as the manager of an investment vehicle to purchase tax liens. Initially, ESC purchased tax liens with equity capital, but due to the liquidity dynamics of its business, it was determined to use both equity and debt financing.

2. In order to facilitate the debt financing, ESC established the Ebury Entities' current structure, which uses different entities to facilitate acquisitions of different assets, with the help of different debt sources. A copy of the current organizational chart is attached as Exhibit A.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, if any, are: EB 1EMIALA (4788), Ebury Street Capital, LLC (7623), EB 2EMIALA, LLC (5175) Ebury Fund 1, LP (1403), Ebury Fund 2 (2178), LP, Red Clover 1, LLC (9780), Ebury RE, LLC (1397), Ebury 1EMI, LLC (4369), Ebury 2EMI, LLC (6849), EB 2EMIMD, LLC (2225), EB 1EMINJ, LLC (2006), EB 1 EMINY, LLC (4213), EB 2EMINY, LLC (3150), Ebury Fund 1 NJ, LLC, RE 1EMI, LLC (2345), RE 2EMI, LLC (7945), Greater Flamingo, LLC (2030).

3. Initially, Capital One National Association ("Capital One") was the sole lender to the Ebury Entities. Between 2014 and 2018, ESC borrowed and repaid approximately $89.5 million in principal and interest to Capital One.

4. In 2016, I was introduced to Emigrant Business Credit Corporation ("EBCC").

5. After an initial diligence period, EBCC provided a term sheet indicating that it was willing to make loans to tax liens, including older portfolios of tax liens which were generally more lucrative but required more servicing attention than younger tax liens.

6. In March 2017, two newly created Ebury Entities closed on two credit lines with EBCC, which originally were due to mature in March 2021 (the "EBCC Loans").

7. Over time, and as the Ebury Entities' business evolved toward older tax liens and EBCC repeatedly asked the Ebury Entities to increase the size of their credit lines (and EBCC's profits), the relationship with Capital One was paid off in full and EBCC became the sole lender to the Ebury Entities' tax liens.

8. A majority of the Ebury Entities' assets began as tax liens and due to the lack of repayment of the liens, resulted in an increased exposure to different assets owned by the Ebury Entities, namely real estate owned due to the foreclosure of tax liens ("REO") and loans related to the disposition of those real estate assets.

9. Upon foreclosure of the tax lien and obtaining the REO, the Ebury Entities would either (a) immediately sell, (b) repair and sell, or (c) repair and rent its REO.

10. As part of this process, the Ebury Entities would make loans and take secured positions in its sold REO to real estate investors who would improve the property through the Ebury Entities' financing.

11. Additionally and as part of the existing asset base, there are outstanding business-related loans that are due to the Ebury Entities. Presently while the Ebury Entities own REO there are no rental properties that generate income.

12. In 2018, Ebury Entities engaged the tax lien brokerage firm Bloxtrade, an affiliate of BCMG Services LLC (collectively with Bloxtrade, "BCMG") and its principal Thomas Mcosker, to sell a substantial portion of its liens in order to retire equity and debt while transitioning to a smaller business focused on older tax liens and special opportunity lien investments.

13. In addition to the discovery of misappropriated escrow funds belonging to other BCMG clients, while representing the Ebury Entities as a broker and escrow settlement agent on tax lien sale transactions, BCMG and Thomas McOsker misappropriated escrowed funds belonging to the Ebury Entities and has failed to remit payments owed by BCMG and Thomas McOsker.

14. In June 2019, certain of the Ebury Entities sued Thomas Mcosker, BMCG and its affiliates for $3,500,000 plus legal fees and Interest. Those litigations are pending in Puerto Rico and the federal district court for the District of Delaware.

15. In order to address the changing capital requirements of the Ebury Entities, in late 2018 ESC began a diligence process with a bank ("Bank A"), which would lend to both liens and REO as collateral. The proposed transaction would retire EBCC's debt.

16. After completing a nine-month diligence process, Bank A's credit committee approved the Ebury Entities for a $20MM line of credit ("LOC"), which Bank A and the Ebury Entities intended to use to retire EBCC's debt.

17. The LOC with Bank A ultimately did not close due to the acquisition of Bank A by Bank B.

18. Certain of the Ebury Entities sued Bank B for failing to close and canceling the LOC transaction. That litigation resulted in a favorable settlement to the Ebury Entities.

19. The Ebury Entities pivoted to other financing alternatives in order to operate its business and begin a pay down of the EBCC Loans.

20. ESC closed a $10MM line of credit for its REO ("REO LOC"), which would enable it to have capital to repair and improve its growing REO investments and have cash out finance to pay down the EBCC Loans.

21. The $10MM REO LOC was successfully opened and activated in February 2020.

22. In April 2020, the ability to draw funds from the REO LOC was paused due to the onset of the COVID 19 Emergency.

23. In addition to the financing issues, the Covid-19 Pandemic was incredibly problematic and debilitating to Ebury Entities' tax liens, loans and REO due to those types of assets requiring a higher degree of legal intervention to promote repayment and gain control of the underlying asset in order to monetize the original tax lien investment.

24. Due to the Covid-19 Pandemic, courts throughout the USA invoked moratoriums on foreclosures and evictions.

25. Accordingly, the Ebury Entities were unable to foreclose on its liens, take effective action to promote repayment or process evictions. This severely limited the ability of the Ebury Entities to fund their daily operations.

26. Throughout the Covid-19 pandemic, the Ebury Entities were current and performing on the EBCC Loans.

27. In exchange for charging higher interest rates, EBCC agreed to extend the Loans' maturity dates through November 2021.

28. In November 2021, EBCC refused to further extend the Loans' maturity dates and declared defaults.

29. The Ebury Entities immediately offered to remain current on its interest payments with EBCC in exchange for a 30 to 90 day extension to explore refinancing options.

30. EBCC rejected all of the Ebury Entities' attempts to make post-maturity payments on the Loans.

31. The Ebury Entities and EBCC's representatives embarked on a twelve month process which included near-daily phone calls with EBCC and its representatives regarding the diligence and verification of the Ebury Entities' assets, the investment banking refinance process undertaken by the Ebury Entities to retire the EBCC Loan and negotiation of a potential extension by EBCC.

32. The Ebury Entities provided EBCC with access to all of its tax lien, loan and REO servicing platforms and Quickbooks. The Ebury Entities have never revoked that access.

33. The Ebury Entities successfully sought and received multiple proposals from take-out lenders to refinance the existing EBCC debt.

34. EBCC refused any and all of these advances by not returning phone calls or engaging counter parties in any substantive fashion.

35. During the summer of 2022, a highly-negotiated repayment plan was agreed to with EBCC.

36. This resulted in a Settlement Term Sheet being sent by EBCC to the Ebury Entities, which would have ultimately resulted in a recovery of over $18 million over a three year term.

37. At EBCC's insistence, I signed and returned the Settlement Term Sheet prepared by EBCC.

38. While awaiting a counter-signature that would lead to final documentation, EBCC through a wholly separate legal counsel initiated litigation in the New York state courts over the defaulted loans and for the first time alleged personal fraud against me individually.

39. Additionally, I understand that EBCC through its lawyers initiated a criminal investigation, which led to both federal criminal and Securities and Exchange Commission investigations into the Ebury Entities and me personally.

40. In December 2023, the United States Attorney's Office for the Southern District of New York charged me with bank and wire fraud, resting its charges on identical conduct as was alleged by EBCC in the New York state court action.

41. In March 2024, federal prosecutors charged me with the same conduct via an indictment, as well as additional charges of money laundering.

42. Despite EBCC's bad faith, the Ebury Entities have continued to try to amicably and commercially resolve the outstanding EBCC Loans.

43. The parties have participated in the mediation services offered by New York state courts and they have independently discussed a resolution.

44. As recently as November 22, 2023, EBCC agreed to a new proposal that would provide a lump sum payment of $13.5 million though a new take-out loan and EBCC requested proof of financing be provided by the proposed lender.

45. The proposed lender provided such proof and a member of the bar verified that he was counsel for the new lender and the availability of funds.

46. Despite fully satisfying the EBCC requirements, EBCC has refused to resolve the pending New York litigation.

47. The strain of ongoing litigations, decreasing and limited cash flow, and EBCC's intentional bad faith and actions targeted at damaging the Ebury Entities and its stakeholders has made the business unviable and insolvent.

48. The current criminal charges have resulted in the loss of critical vendors in each Ebury Entities' business, below-market bids for the Ebury Entities' assets, failed transactions with long-term counterparties, and counterparties' purposeful delay in the repayment of matured obligations to the Ebury Entities, further constraining its ability to maintain operations.

49. On March 25th, the Ebury Entities were served with a restraining order which does not allow for the payment of any normal operating expenses, payroll, phones, other payments needed to protect the assets currently owned. This order will result in the complete failure of the Ebury Entities' businesses with little to no recovery for any stakeholders of the Ebury Entities.

50. In order to address the myriad of litigation that is currently pending and maximize the value of existing assets, I made the determination that it is in the best interest of the creditors to file the pending bankruptcies.

## Current Operations and Assets

51. From a high of 12 states, the ESC entities currently operate in approximately 6 states, including Alabama. The assets of the Debtor include existing cash, liens, loans and real estate holdings (commonly referred to as "REO"). ESC had roughly 4 employees at the end of Covid and has since decreased its staff to 4. It anticipates further reductions as needed.

52. As part of the reorganization process, ESC intends to engage professionals to sell existing assets, resolve existing litigation, initiate new litigations to recover assets, review claims and ultimately make distributions to valid claimants.

## First Day Motions

53. As part of the bankruptcy process, on behalf of ESC various initial and first day motions have been filed. These include the following:

   A. *Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases;* ("Joint Administration") *and*

   B. *Debtors' Motion for Authorization to File a Consolidates List of the Debtors' 20 Largest Unsecured Creditors, and File a Consolidated List of Creditors;* ("Consolidation of Creditors") *and*

   C. *Debtors' Expedited Motion for Order Transferring Venue from Southern Division to Northern Division of the United States Bankruptcy Court for the Middle District of Alabama;* ("Transfer Venue") *and*

   D. *Debtors' Motion for Expedited Hearing on First Day Motions;* ("Expedited Hearing") *and*

   E. *Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105 and 363 Authorizing Continued Use of Existing Bank Accounts and Cash Management Systems;* ("Bank Accounts") *and*

   F. *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 366, and 503(b) to Establish Procedures for Determining Adequate Assurance of Payment for Utility Services;* ("Utilities") *and*

G. *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authorization to Pay Pre-Petition Wages, Compensation, and Employee Benefits.* ("Employee Wages")

## Procedural Motions

54. ESC filed procedural motions that should streamline the bankruptcy process. Namely, ESC has filed motions for Joint Administration, Consolidation of Creditors, and Transfer Venue. Each of these motions should allow the consolidated and expeditious prosecution of the pending Chapter 11 bankruptcy in a venue that better serve the needs of all the interested parties and streamlines judicial and administrative resources. I believe that these motions are proposed in good faith and are in the best interests of the creditors and the judicial process.

## Substantive Motions

55. ESC has contemporaneously filed a motion for an expedited hearing in order to address substantive first day motions that are time sensitive. In addition to the foregoing procedural Motions, ESC seek an expedited review of motions related to the Debtors' Bank Accounts, Utilities and Employee Wages. As to each of these first day motions ESC would further state as follows:

    a. <u>Bank Accounts.</u> In this Motion, ESC seeks this court's permission to use existing bank accounts. Prepetition the Debtor has reduced the bank accounts it uses to address its needs across a number of states. For the remaining accounts to discontinue using them would provide a significant hardship on the Debtors and the various vendors it uses to service its broad number of real estate interests. As part of this request, ESC further acknowledges the need to work with the Bankruptcy Administrator's office to insure for the proper accounting and protection of these accounts

post-petition. ESC believes that the granting of the Bank Accounts matter is in the best interest of the estate and its creditors.

    b.    <u>Utilities.</u> ESC has multiple providers of utilities across a number of states. In this motion ESC seeks to both protect services provided by those utility providers, as well as, streamline the process for resolving issues and disputes that may arise in the future without the need of multiple and time consuming hearings by the court. ESC believes granting the Utilities motion is in the best interest of the bankruptcy estate and its creditors.

    c.    <u>Employee Wages.</u> ESC currently has a small, yet experienced staff dedicated to serving the needs of creditors and the estate. The normal payroll of this staff is staggered for these employees and is a prepetition expenditure which would classified as a priority claim. In order to prevent undue hardship and to streamline the bankruptcy process, ESC seeks in this motion to ensure that the regular payroll of each of its employees is not disrupted by the bankruptcy filing. ESC believes that granting the Employee Wages is in the best interest of the estate of its creditors.

56. In summary, I as the Managing Member of Ebury Street Capital, LLC and its affiliated entities believe that proceeding under Chapter 11 is both necessary and appropriate. Further I believe that the Courts timely consideration and approval of the pending motions identified above with expedite and ensure the smooth entry of the Debtors into the reorganization process.

By: _____
John Hanratty
Managing Member

Sworn to before me this 13th of May, 2024.

_____
Notary Public

EDWARD G. HANRATTY
ATTORNEY-AT-LAW
STATE OF NEW JERSEY

_____
John Hanratty

# Exhibit A

EB 1EMIALA, LLC
Ebury Street Capital, LLC
EB 2EMIALA, LLC
Ebury Fund 1, LP
Ebury Fund 2, LP
Red Clover 1, LLC
Ebury RE, LLC
Ebury 1EMI, LLC
Ebury 2EMI, LLC
EB 2EMIMD, LLC
EB 1EMINJ, LLC
EB 1EMINY, LLC
EB 2EMINY, LLC
Ebury Fund 1 NJ, LLC
RE 1EMI, LLC
RE 2EMI, LLC
Greater Flamingo, LLC