**Fill in this information to identify the case:**

Debtor Name: Ebury Street Capital LLC

United States Bankruptcy Court for the: Middle District of Alabama

Case number: 2:24-bk-10499

☐ Check if this is an amended filing

# Monthly Operating Report for Non - Small Business Under Chapter 11

06/2019

Month: October 2024
Date report filed: 08/30/2024 (MM / DD / YYYY)

Line of business: Tax Receivables and REO Estate
NAISC code: 5311

**In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.**

Responsible party: Mr. John Hanratty
Original signature of responsible party: /s/ John Hanratty
Printed name of responsible party: John Hanratty

## 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

**If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.**

| # | Question | Yes | No | N/A |
|---|---|---|---|---|
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☐ | ☑ | ☐ |
| 4. | Did you pay your employees on time? | ☐ | ☑ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☐ | ☐ | ☑ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☐ | ☑ |
| 7. | Have you timely filed all other required government filings? | ☐ | ☐ | ☑ |
| 8. | Are you current on your quarterly fee payments to the Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☐ | ☑ | ☐ |

**If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.**

| # | Question | Yes | No | N/A |
|---|---|---|---|---|
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☑ | ☐ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Debtor Name _____     Case number_____

17. Have you paid any bills you owed before you filed bankruptcy?   ☐ ☑ ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?   ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

    This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

    $ 226449.93

20. **Total cash receipts**

    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.    $ 0

21. **Total cash disbursements**

    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

    Report the total from *Exhibit D* here.    − $ 0

22. **Net cash flow**

    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.    + $ 0

23. **Cash on hand at the end of the month**

    Add line 22 + line 19. Report the result here.

    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

    This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.    = $ 226449.93

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**    $ 30034719.50

    *(Exhibit E)*

## 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**  $ _____ 0

    *(Exhibit F)*

## 5. Employees

26. What was the number of employees when the case was filed? _____ 6
27. What is the number of employees as of the date of this monthly report? _____ 0

## 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?  $ _____ 0.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $ _____ 0.00
30. How much have you paid this month in other professional fees?  $ _____ 0.00
31. How much have you paid in total other professional fees since filing the case?  $ _____ 0.00

## 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | *Column A* **Projected** Copy lines 35-37 from the previous month's report. | − | Column B **Actual** Copy lines 20-22 of this report. | = | *Column C* **Difference** Subtract Column B from Column A. |
|---|---|---|---|---|---|
| 32. **Cash receipts** | $ _____ 0 | − | $ _____ 0 | = | $ _____ 0 |
| 33. **Cash disbursements** | $ _____ 0 | − | $ _____ 0 | = | $ _____ 0 |
| 34. **Net cash flow** | $ _____ 0 | − | $ _____ 0 | = | $ _____ 0 |

35. Total projected cash receipts for the next month:  $ _____ 0
36. Total projected cash disbursements for the next month:  **-** $ _____ 0
37. Total projected net cash flow for the next month:  **=** $ _____ 0

Debtor Name   _____    Case number_____

## 8. Additional Information

Check the box to the left and file copies of the following documents.

☑  38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☐  39.  Current balance sheet as of the reporting period.

# Exhibit A

3.        The Debtor was not permitted to pay its bills on time.
4.        The Debtor was not permitted to pay its employees on time.
8.        The Debtor was not permitted to pay its quarterly fee to the Bankruptcy Administrator.
9.        The Debtor was not permitted to pay property insurance premiums.

# Exhibit B

10.       The accounts are disclosed on the Debtors initial filing.
13.       The insurance company cancelled the policy.

# Exhibit C

NONE

# Exhibit D

NONE

# Exhibit E

30,034,719.50        United States Government        Unknown

    2.2    <u>Overadvances</u>. In the event the unpaid principal amount of the outstanding Advances under the Line of Credit ever exceeds the Borrowing Base, the excess amount (an "**Overadvance**") shall be paid by the Borrower within three (3) Business Days after written notice from the Lender. Overadvances shall bear interest at the rate stated in the Note. The Borrower acknowledges and agrees that the Lender is not obligated to the Borrower to fund any Advance that would create an Overadvance.

    5.13    <u>REO Properties</u>. The Borrower and the other Ebury Companies other than RE 2EMI LLC do not own any REO Properties.

8.8     Distributions. The Ebury Companies shall not make any distributions if: (a) an Event of Default has occurred; (b) an event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default; or (c) the distribution made or to be made will cause the Borrower to violate, or fail to comply fully with, any of the terms and conditions of, or to default under this Agreement or any other Transaction Document (including, without limitation, the financial covenants in Article VII). In addition to the limitations set forth in the first sentence of this Section 8.8, the Borrower shall not make any distributions in excess of $5,000,000 in any calendar year. For purposes of this Section, the term "distribution" includes all cash distributions paid to the holders of Equity Interests in any Ebury Company, and the value of all non-cash distributions made to the holders of Equity Interests in any Ebury Company.

8.8     Distributions. The Ebury Companies shall not make any distributions if: (a) an Event of Default has occurred; (b) an event has occurred that, with notice, the lapse of time or otherwise, could constitute an Event of Default; or (c) the distribution made or to be made will cause the Borrower to violate, or fail to comply fully with, any of the terms and conditions of, or to default under this Agreement or any other Transaction Document (including, without limitation, the financial covenants in Article VII). In addition to the limitations set forth in the first sentence of this Section 8.8, the Borrower shall not make any distributions in excess of $5,000,000 in any calendar year. For purposes of this Section, the term "distribution" includes all cash distributions paid to the holders of Equity Interests in any Ebury Company, and the value of all non-cash distributions made to the holders of Equity Interests in any Ebury Company.

On or about October 9, 2018, at approximately 3:52 p.m., Mr. Salerno appeared at the Fund's Rye, New York offices in order to pick up certain checks. At approximately 4:00 p.m., after retrieving those checks from Mr. Ping Xie of the Fund, Mr. Salerno inexplicably demanded checks be issued for all of his other clients. Mr. Xie informed him that he could not issue those checks because there were insufficient funds in the Fund's capital account. Mr. Salerno became enraged and began to scream at Mr. Xie, threatening that if he did not produce the checks he would call the Federal Bureau of Investigation. When Mr. Xie attempted to escape the office, Mr. Salerno continually blocked his path. Mr. Xie has stated that he was "extremely afraid" and "did not think that he would see his home that night" because Mr. Salerno was "much stronger."

Mr. Salerno's actions violated New York State Penal Law, Section 135.05, Unlawful Imprisonment in the Second Degree. This is not the only time Mr. Salerno threatened an Ebury employee with an FBI investigation.

Afraid of what may happen if he refused to provide the checks, Mr. Xie called Mr. John Hanratty, of the Fund, in Puerto Rico. In an attempt to facilitate Mr. Salerno's departure, Mr. Hanratty acquiesced to his demands with the stipulation that the checks were not to be deposited until the pending property transactions occurred and funds were deposited to cover all of the checks.

The Lesser of Two Weasels?

As we lament the many plagues of the Dan Snyder era, consider this: Howard Milstein could own the Redskins.

His record bid for the Redskins, $800 million, was rejected by the N.F.L., wary of his debt burden and brawling reputation. The family name wasn't burnished any when, shortly before he filed a suit claiming he was undermined by the N.F.L.'s favored bidder, John Kent Cooke, Mr. Milstein sent a family employee to Bermuda wearing a wire, posing as an investor in an attempt to get Mr. Cooke to say something incriminating. (The ruse failed; Mr. Cooke and Mr. Milstein are still fighting in court.)

b. All loans and leases (reported in Schedule RC-C, part I, items 1 through 10, column B, above) EXCLUDING closed-end loans secured by first liens on 1-4 family residential properties (reported in Schedule RC-C, part I, item 1.c.(2)(a), column B, above) with a remaining maturity or next repricing date of: M.2.b.
1. Three months or less................................................................................................................... RCONA570 | 3,003,880 | M.2.b.1.

FILED: NEW YORK COUNTY CLERK 09/28/2022 07:39 PM        INDEX NO. 656284/2022
NYSCEF DOC. NO. 192                                      RECEIVED NYSCEF: 09/28/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------x
                                                           :
NICKLAUS COMPANIES, LLC,                                   :    Index No. 656284/2022
                                                           :
                          Plaintiff,                       :    **AFFIDAVIT OF**
                                                           :    **JACK W. NICKLAUS**
           - against -                                     :    **(DIRECT TESTIMONY)**
                                                           :
GBI INVESTORS, INC. and                                    :
JACK W. NICKLAUS                                           :
                                                           :
                          Defendants.                      :
                                                           :
-----------------------------------------------------------x

JACK W. NICKLAUS, being duly sworn, deposes and says:

1. I offer this Affidavit in connection with the evidentiary hearing scheduled to begin on September 30, 2022.

FILED: NEW YORK COUNTY CLERK 09/28/2022 07:39 PM        INDEX NO. 656284/2022
NYSCEF DOC. NO. 192                                      RECEIVED NYSCEF: 09/28/2022

**Q.    Was that before or after the Company filed this lawsuit in New York?**

It was before. The Company officials who asked me to continue working on existing projects didn't tell me that the Company was planning to file a lawsuit in New York filled with false statements intended to disparage my reputation.

**Q. Did your relationship with Mr. Milstein change after he obtained permanent control over the Company?**

It did. Once Howard had permanent control of the Company, he acted as if he *owned* me. He tried to control every aspect of my life, from what I did, to

whom I spoke with, to where I went, as if I was his property. I always tried to be respectful, but there was no respect in return. I also tried very hard to make the relationship work, but it became increasingly obvious that I had aligned myself with a person who didn't respect me as a human being.

**Q. Did you discuss a way to buy Emigrant out?**

I did bring that up with Howard. I think it was in late 2016 or early 2017. I told Howard that I wanted the opportunity to raise the money needed to repay the $145 million loan and buy him out of the Company. With the roughly $80 million in interest that had been paid to Emigrant by that point, it would have represented a reasonable return on a 10-year investment during a period that included a recession. Unfortunately, Howard said he was not interested in being bought out and refused to bring the proposal to the Board for consideration.

**Q. Did your relationship with Mr. Milstein get any better after you retired from your employment with the Company?**

No, it got even worse. In 2018, Howard had Jim Schnare threaten to sue my son Gary because he had filed a trademark application for a business which included his last name. The business was called Nicklaus Brown & Co. and had been in existence for years. Gary initially refused to withdraw the application. The Company then sued one of Gary's other companies, Camden Capital, because the firm had a photo on its website of me holding Gary as a child. The photo had actually been provided by the Company, and the Company's Co-Chairman – me – had given Gary permission to put it on the website. But that didn't matter to Howard. He threatened to litigate the issue until the cows came home unless Gary

- 17 -

agreed to withdraw his trademark application and take the photo down from the website. Gary didn't feel he should have to do those things, but he went along with it, as he didn't want to spend years in court fighting about it. Still, Howard wasn't appeased. Gary had been one of GBI's designates to the Company's Board since the beginning but didn't receive another invitation to a Board meeting after withdrawing the trademark application until last month, right before the Company sought its injunction against me.

**Q. Were there any further negotiations with Howard Milstein?**

There were additional negotiations in 2019 and 2020. Howard wanted us to transfer our Class A Units to his family. He also wanted me back as an employee and offered me a lot of money. I gave it serious consideration as Barbara and our kids would have received continuing payments after my death. The negotiations got as far as a non-binding term sheet, but things fell apart after that. We then reached a handshake deal through email on a few things, including the revenue participation amounts I would receive for providing services to the Company during my five-year non-compete period.

**Q. Were those false statements repeated in news articles about the lawsuit?**

Many of them were, including in my hometown paper, the Columbus Dispatch.

**Q. Which false statements concerned you the most?**

The Company's lawsuit says that I was preparing to accept a leadership role with the new Saudi golf league now known as LIV Golf, and Company officials had to convince me to turn it down to save me from myself. There is not an ounce of truth to that.

**Q. Do you know why Mr. Milstein and the Company would make false statements about that in their lawsuit?**

I do. Howard wanted the lawsuit to include red meat for a national news story that would paint Howard as virtuous and me as otherwise. The meetings with the Saudis had happened a while ago, and my letter respectfully rejecting the offer had long been hanging on the wall of Jay Monahan's office. The Saudi golf league has no relevance to anything in the dispute between Howard and me, but he included a false version of the story anyway, knowing that it was certain to grab headlines – which it did. He also knew that I would have no interest in fighting him in the media, as that is not something I would ever do. Howard claims that this lawsuit was needed to protect my brand, but all it's done is damage that brand.

# State Supreme Court Denies Milstein's Appeal to Tear Down Historic Midcentury Modern Home

TUESDAY, 24 OCTOBER 2023 15:52   LAST UPDATED: TUESDAY, 24 OCTOBER 2023 16:10   PUBLISHED: TUESDAY, 24 OCTOBER 2023 15:52   JOANNE WALLENSTEIN  



"The Board of Trustees additionally found that the residence is worthy of preservation because (architect) Zelnik was a master, and the residence is the work of a master, citing Zelnik's achievements and the letter in support of preservation from the President of the Bronx Chapter of AIA."

The issue was even covered in the Wall Street Journal (https://www.wsj.com/real-estate/luxury-homes/local-building-dispute-over-architect-in-wealthy-scarsdale-cad75e4d) in an article that sought to cast doubt on the status of Zelnik in the world of architecture. The piece, said, "You'd be forgiven for not knowing the name of Simon B. Zelnik, a respected-but-not-celebrity New York architect who died in 1980." However, the article did not sway Judge Neary.

# Exhibit F

NONE